**MERCK–MEDCO MANAGED CARE, INC.**

v.

**RITE AID CORPORATION, et al.**

No. Civ. L–96–499.

United States District Court,
D. Maryland.

Aug. 13, 1998.

James P. Tallon, Andrew W. Feinberg, and Daniel D. Edelman, of New York City, and Scott Patrick Burns, and John B. Isbister, of Baltimore, MD, for plaintiff/counter-defendant Merck–Medco Managed Care, Inc.

Lewis A. Noonberg, and Leonard L. Gordon, for defendant/counter-claimant Rite Aid Corporation and defendant Eagle Managed Care Corporation.

Michael F. Brockmeyer, and Jay I. Morstein, of Baltimore, MD, for defendant Epic Pharmacy Network, Inc.

Jacob A. Stein, Glenn A. Mitchell, and David U. Fierst, of Washington, DC, for defendant Giant Food, Inc.

Ward B. Coe, III, Elise R. Davison, and Pamela M. Conover, of Baltimore, MD, for defendant NeighborCare Pharmacies, Inc.

Paul M. Sandler, and Joseph J. Coppola, of Baltimore, MD, for movant National Prescription Administrators, Inc.

## MEMORANDUM

LEGG, District Judge.

This is an antitrust suit. In September, 1995, the State of Maryland awarded to the plaintiff, Merck–Medco Managed Care, Inc. ("Medco"), a contract to manage the prescription drug benefits program for State employees and retirees (the "Maryland Plan"

or the "Plan"). Under the terms of the award, Medco was required to assemble an extensive statewide network of pharmacies agreeing to fill prescriptions at a steeply discounted rate.[1]

The Maryland Plan was scheduled to go "live" on January 1, 1996. By mid-December, 1995, however, the State had grown concerned about Medco's ability to put together a satisfactory network in time. On December 20, 1995, the State issued an "ultimatum" to Medco, requiring Medco to submit a certified list of participating pharmacies within three days. Because Medco failed to assemble a network satisfactory to the State, the State terminated Medco's contract on December 27, 1995. Ultimately, the State rebid the contract, and awarded it to one of Medco's competitors.

The defendants own or represent approximately one-half of the retail pharmacies in Maryland.[2] On February 20, 1996, Medco filed the instant suit, alleging that the defendants, concerned that the Plan's deeply discounted rate would squeeze their profits, jointly agreed to sabotage the Plan by boycotting Medco's network. In its complaint, Medco claims that the group boycott restrained trade and, therefore, violated Section 1 of the Sherman Act[3] (Counts 1 and 2), and the Maryland Antitrust Act[4] (Counts 3 and 4).

Medco's complaint also advances two ancillary claims. In Count 5, filed under the Lanham Act,[5] Medco claims that a newspaper advertisement, taken out by Rite Aid to criticize the award to Medco, was false and misleading. In Count 6 of the complaint, Medco claims that the defendants tortiously interfered with Medco's contractual relations with the State of Maryland.

In opposing the suit, the defendants denied the existence of a conspiracy, contending that the decision of each not to participate in the Maryland Plan was individual and unilateral. Rite Aid also filed a four-count, non-compulsory counterclaim challenging Medco's business practice of submitting bids that list Rite Aid as a network participant without first obtaining Rite Aid's consent.[6]

Following extensive discovery, the parties filed cross-motions for summary judgment.[7] The Court held four hearings on the cross-motions.[8] Having carefully considered the record and the arguments of counsel, the Court concludes that Medco's evidence does not tend to exclude the possibility of independent conduct on the part of the defendants. The evidence is, therefore, insufficient to support a reasonable inference of a conspiracy to violate the antitrust laws. Stated otherwise, a jury would be required to speculate in order to find the existence of a conspiracy among the defendants. Accordingly, by separate Order, the Court shall grant the defendants' motion for summary judgment on Medco's antitrust claims (Counts 1 through 4 of the complaint).

---

1. The network was to be large enough so that there would be a participating pharmacy within a one-mile radius of each State employee's home. *Defendants' Exh. 6, August 9, 1995, Cover Letter to Medco's Best and Final Offer.*

2. The defendants are Rite Aid Corp. ("Rite Aid"), Eagle Managed Care Corp. ("Eagle"), Giant Food, Inc. ("Giant"), NeighborCare Pharmacies, Inc. ("NeighborCare"), and the EPIC Pharmacy Network, Inc. ("EPIC").

3. 15 U.S.C. § 1.

4. Md.Code Ann., Comm. Law II § 11–204(a)(1). Section 11–204(a)(1) of the Maryland Antitrust Act is the state law analogue of Section 1 of the Sherman Act. *Quality Discount Tires, Inc. v. Firestone Tire & Rubber Co.*, 282 Md. 7, 11, 382 A.2d 867 (1978). For purposes of this litigation, the parties agree that the two provisions are to be considered *pari passu.*

5. Medco seeks relief under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

6. Rite Aid's counterclaim advances causes of action for intentional and negligent misrepresentation (Counts 1 and 2), unjust enrichment (Count 3), and injurious falsehood (Count 4).

7. The parties' submissions at summary judgment were accompanied by a voluminous record, consisting of over 350 pages of briefs and approximately 2,500 pages of exhibits and deposition transcripts.

8. Three hearings were held in open court on Thursday, February 12, 1998, Friday, February 13, 1998, and Wednesday, April 29, 1998. The last hearing was conducted by telephone conference, on the record, on Thursday, April 30, 1998.

The Court also concludes that there is insufficient evidence to support a jury verdict on either Counts 5 and 6 of Medco's complaint, or Rite Aid's counterclaim.[9] Accordingly, also by separate Order, the Court shall grant summary judgment on these claims and close the case.

## I. Background

### a. The Parties and the Industry

In 1995, four of the defendants were engaged in the retail pharmacy business, as follows:

**Rite Aid,** one of the largest U.S. drug store chains, operated some 180 pharmacies in Maryland, employing almost 2,700 people.

**Giant** owned 116 supermarkets in the Mid–Atlantic region.[10] Each of Giant's 76 Maryland stores included a pharmacy section.

**NeighborCare** operated 20 pharmacies, all of which were in Maryland. NeighborCare does not sell "front end" goods, such as beauty aids, tobacco products, magazines and groceries. Instead, NeighborCare focuses on sales of pharmaceuticals, and most of its facilities are located within hospitals or medical centers.

**EPIC** is an umbrella organization that represents the interests of independently owned, or "non-chain," retail pharmacies. One of EPIC's principal objectives is to obtain for its members some of the economies of scale (e.g. group buying and advertising) enjoyed by chain drug stores. In 1995, EPIC's membership included over 200 independent pharmacies in Maryland. Some of these pharmacies sell "front end"

goods, while others sell only pharmaceuticals.

The fifth defendant, **Eagle,** is a wholly owned subsidiary of Rite Aid. Eagle is a Pharmacy Benefits Manager ("PBM") and, as such, competes directly with Medco. In partnership with EPIC, Eagle was an unsuccessful bidder for the Maryland contract.[11]

The plaintiff, Medco, is a wholly owned subsidiary of international drug manufacturer Merck & Co., Inc. Medco is the second largest PBM in the United States.

PBMs were created in response to the rising cost of pharmaceutical products. Before PBMs, drug dispensation tended to be relatively disorganized from an economic standpoint. Employers provided pharmaceutical benefits to their employees through insurance indemnity plans. A covered employee would take his prescription to a local retail pharmacy, pay the pharmacy directly, and submit the receipt to the insurance company. The insurer would reimburse the employee for a percentage of the drug's retail price.[12] According to industry analysts, this system was decentralized, inefficient, and resulted in high drug prices. Plaintiff's Exh. 2, Expert Report of Daniel S. Levy ("Levy Report"), at 3.

PBMs sought to address these problems by administering pools of claims. A PBM such as Medco will contract with a "plan sponsor," usually a large employer or a group. For a fee, the PBM creates and manages a drug benefits program for the sponsor's employees or members. In a variety of ways, PBMs can reduce the sponsor's costs.

**9.** At oral argument, counsel for both sides conceded that the remaining claims and counterclaims were ancillary to the central antitrust dispute. The parties did not devote substantial effort to discovering or briefing the non-antitrust issues.

**10.** Giant also operated three free-standing pharmacies.

**11.** As a PBM, Eagle itself neither owns nor operates retail pharmacies. In 1995, Joel Feldman, who was Senior Vice President of Managed Care for Rite Aid, also served as President of Eagle. Eagle signed a "Teaming Agreement" with EPIC

under which the two organizations submitted a joint, albeit unsuccessful, bid for the Maryland employees contract. Medco does not challenge the antitrust legality of the Teaming Agreement. Medco does contend, however, that Feldman was a conduit of information and cooperation between Rite Aid and EPIC. Through Feldman, Rite Aid and EPIC reached a collusive agreement to boycott Medco's network, Medco alleges.

**12.** The percentage, typically between 70 and 80 percent, varied according to the terms of the insurance contract.

For example, a PBM will put together a network of participating pharmacies. In exchange for the privilege of being included in the network, a pharmacy must agree to dispense drugs at a discount, often a substantial one. For each prescription filled, the PBM reimburses the pharmacy under a formula based on the drug's average wholesale price ("AWP") less a percentage, plus a dispensing fee. In connection with the Maryland Plan, for instance, network pharmacies were to be reimbursed at a rate of AWP minus 15% plus $2.00.

PBMs can also reduce claims processing costs. For each prescription filled, PBMs handle the "paperwork" through a centralized computer system, which enables PBMs to maintain detailed records for each beneficiary, monitor each patient's drug usage, and prevent patients from taking ineffective or incompatible drugs.[13]

Finally, PBMs can also lower costs through the use of "formularies," or lists of preferred or recommended drugs. Drug manufacturers competing for market share have a strong interest in seeing their products included in these formularies. The manufacturers may offer significant discounts for the privilege of being listed. General Accounting Office, *Pharmacy Benefit Managers: Early Results on Ventures with Drug Manufacturers*, 1995 WL 788179 (GAO Report) at 7.

As more and more companies have entered the PBM business, competition among them to sign up plan sponsors has increased. With respect to price, the PBM that can offer the greatest discount gains a decided edge in winning contracts. Over time, PBMs have insisted on ever steeper discounts, often presenting pharmacies with difficult economic choices whether to join a network or not.

Many considerations will influence a pharmacy's decision. These include the size of the discount, the number of "lives" covered by a particular plan, the pharmacy's market share in the region, the PBM's reputation for prompt payment, and whether a particular network is "open" or "closed."[14] "Open" networks permit any pharmacy to enter or exit at any time. By contrast, in a "closed" network, the membership is fixed at a certain date and other pharmacies may not join afterward.[15]

Pharmacies are more willing to accept a steep discount in order to gain entrance into a closed network, especially when the network is small, because the discount is likely to be offset by an increase in customer volume. In open networks, by contrast, the prospect of increased volume is more difficult to evaluate because newcomer pharmacies may enter the plan after it becomes operational, diluting market share. *See* Deposition of Ann Cooper at 75.[16]

The relationship between PBMs and retail pharmacists has been strained from the beginning. Around the country, pharmacists complain that PBMs have done little more than add another expensive link to the distribution chain. PBMs are also slow to pay, have eroded their profit margins, and burdened them with more paperwork, pharmacies argue. *Third-party Plans Flourish, Chain Drug Review*, Mar. 14, 1994, 1994 WL 12763972, at 2.

As an additional sore subject, most PBMs fill prescriptions by mail, thereby directly competing with retail pharmacies.[17] PBMs usually promote their mail order service by offering lower beneficiary co-payments, or

---

13. As noted below, the retail pharmacy community disputes whether PBMs have actually reduced administrative costs. Pharmacists have complained of increasing administrative difficulties, such as long delays in receiving reimbursement from PBMs.

14. A pharmacy chain with a strong market share in the region covered by a plan may be less willing to accept a steep discount. Conversely, a chain seeking to strengthen its market share may elect to sacrifice short term profits in order to grow.

15. PBMs also make use of "standing" networks. In these networks, pharmacies agree in advance to participate in any plan put in place by a PBM in accordance with preestablished criteria (primarily price).

16. Conversely, closed networks, especially small ones, are less attractive to plan sponsors.

17. Many PBMs evolved from mail order companies.

allowing beneficiaries to obtain a larger supply of maintenance drugs per prescription. Over the years, street corner pharmacists have lost considerable market share to mail orders.

The already strained relationship between retail pharmacies and PBMs was further exacerbated when large drug manufacturers began acquiring their own PBMs. Michael F. Conlan, *Mission: Cooperation: Is Pharmacy–Industry Cooperation an Impossible Goal?, Drug Topics* Jul. 24, 1995, 1995 WL 8066498 at 2–3.[18] These mergers put a single entity in control of the price at two distribution levels: (i) the price at which pharmacies must buy inventory, and (ii) the price at which pharmacies must sell drugs to the public. The antitrust implications of this vertical integration attracted complaints from retail pharmacists and the attention of federal regulators. *See GAO Report, passim.*

Pharmacies also complain that the wave of PBM/manufacturer mergers has intensified the competition they face from mail order services. Manufacturers sell drugs to their PBM subsidiaries at discriminatory low prices, pharmacists allege.

Retail pharmacy groups have organized to counter these trends in the industry. On April 1, 1995, several pharmacy trade associations and chains, including Rite Aid, filed suit in Federal court in Chicago. The suit, which names several manufacturers (including Merck & Co.) and PBMs as defendants, alleges price-fixing, conspiracy, and other antitrust violations. Hundreds of similar lawsuits filed around the country have been consolidated before the United States District Court for the Northern District of Illinois, where they are pending. *See In Re Brand Name Prescription Drugs Antitrust Litigation,* No. 94–C–897.

In addition, pharmacy trade associations and chains have lobbied state legislatures to enact so-called "fair pricing" laws. In essence, such bills would preclude drug manufacturers from offering lower prices to their own PBM mail order services than to retail pharmacies.

In Maryland, the retail pharmacy lobby succeeded in introducing fair pricing legislation in the 1995 legislative session of the Maryland General Assembly. The bill, however, died in committee. In the fall of 1995, during the time of the events leading up to this suit, the Maryland retail drug industry and its lobbyists were making concerted efforts to have fair pricing legislation reintroduced during the upcoming 1996 legislative session.[19]

Also in the fall of 1995, the State of Maryland was considering a transfer of its Medicaid population into managed care. Concerned that the State would use a PBM system, pharmacy lobbyists sought legislation "carving out" pharmacy benefits from the Medicaid transfer. The fall of 1995, therefore, saw a flurry of meetings and telephone conferences among industry representatives, their lobbyists, and trade associations to address these issues.

#### b. Award and Cancellation of Medco's Contract

In 1995, a PBM named Prescription Card Services Health Systems, Inc. ("PCS"), managed the prescription drug benefits program for employees and retirees of the State of Maryland. Under the PCS program, pharmacies were reimbursed at the rate of AWP minus 8% plus a $3.75 fee. PCS's contract with the State began in 1992 and was set to expire on December 31, 1995.

During the first half of 1995, industry consultants advised the State that the PCS reimbursement rate was significantly above market. Deposition of Ann Cooper at 51. In an

---

**18.** The first such transaction, which created the plaintiff entity in this case, was Merck & Co.'s acquisition of Medco Containment Services, Inc., of Montvale, N.J., in the summer of 1993. That merger was followed by several other similar combinations in the industry, notably Eli Lilly & Co.'s merger with Prescription Card Services ("PCS") Health Systems, Inc., and SmithKline Beecham Corp.'s merger with Diversified Phar-

maceutical Services, Inc. This trend has attracted considerable notice from both Congress and the Federal Trade Commission. *GAO Report* at 3.

**19.** The General Assembly meets each year from January to March. The Fall preceding a legislative session is the time when lobbying efforts intensify.

attempt to obtain more competitive terms, the State, on June 16, 1995, issued a Request for Proposals ("RFP"). Both Medco and Eagle responded.

Medco's "Proposal," [20] submitted on July 14, 1995, offered mail order service, plus a choice of two different pharmacy networks. The first was the Maryland Exclusive Network ("MEN"), which offered 822 pharmacies and a reimbursement rate of AWP minus 15% plus either $2.00 for branded prescription drugs or $2.50 for generic drugs. The second was the Coordinated Care Network III ("CCN III"), which offered 896 pharmacies and a reimbursement rate of AWP minus 13% plus either $2.00 for branded prescription drugs or $2.50 for generic drugs. Defendants' Exh. 2. Later, with the submission of its Best and Final Offer ("BAFO") on August 9, 1995, Medco added a third proposed network, the Coordinated Care Network II ("CCN II"). This third choice offered participation by 99.2% of all Maryland pharmacies, at a price equal to AWP minus 12%, plus $2.25 for branded prescription drugs. Defendants' Exh. 6.[21]

For each proposed network, Medco submitted a list of participating retail pharmacies. Each list included all of the defendants' outlets, except NeighborCare's. Before submitting its bid, Medco, in conformity with what it argues is industry practice, did not contact the pharmacies to determine whether they wished to be included.

Instead, Medco listed the pharmacies participating in one of its standing networks.[22] Medco claims that it was customary for it to assume that the pharmacies participating in a standing network would participate in any new program offering the network reimbursement rate. Medco claims that a pharmacy, in order to join a standing network, must agree to service all plans bid by Medco at that network's rate.

The defendants dispute this assertion. They contend that they are entitled to, and in fact customarily do, analyze each new plan before agreeing to join. In its counterclaim, Rite Aid challenges as a deceptive business practice Medco's custom of submitting bids that enumerate Rite Aid as a participating pharmacy without Rite Aid's prior approval.

This dispute need not be resolved here. It is undisputed that none of the defendant pharmacies were contractually obligated to participate in the Maryland Plan. In its RFP, the State of Maryland insisted that bidders use open networks. The networks upon which Medco based its bid were closed rather than open. Thus, the Maryland Plan was distinct from Medco's existing networks, and none of the defendants were contractually obligated to join it.

On July 17, 1995, Eagle entered into a Teaming Agreement with EPIC. Among other terms, Eagle and EPIC contracted to "agree on the price and other financial terms to be proposed to the State," and to share the costs of retaining the law firm of Piper & Marbury as legal counsel. Plaintiff's Exh. 17 at 4. Eagle and EPIC submitted a joint proposal to the State of Maryland on July 19, 1995. Plaintiffs' Exh. 18.

On August 4, 1995, the Maryland Department of Budget and Fiscal Planning advised Medco that it had been selected as a finalist.[23] Eagle and EPIC did not make it to the

---

**20.** Medco's proposal was titled "A Pharmacy Benefit Management Services Program for the State of Maryland." Defendants' Exh. 2.

**21.** Medco's revenues from a plan consist of (i) administrative fees, and (ii) proceeds from mail order service. Medco's Proposal provided incentives for beneficiaries to mail in prescriptions. Co-payments were lower, and beneficiaries could obtain larger supplies through mail order. At the request of the State, Medco subsequently modified its Proposal to reduce these incentives, primarily by eliminating the difference in supplies available through mail order as compared to retail purchases.

**22.** In this case, all three networks in Medco's proposal offered reimbursement rates taken from some of Medco's standing networks. The MEN rate was taken from Medco's Exclusive Provider Network (EPN), and the two CCN rates were taken from Medco's networks bearing the same names.

**23.** August 4, 1995, Letter of Patrick N. Renaud, Executive Director of the Employee Benefits Division of the Maryland Department of Budget and Fiscal Planning, to Drew Fromkin, Vice-President of Sales for Medco. Defendants' Exh. 4.

finals. In its letter to Medco, the State requested a number of clarifications, including confirmation of the number of pharmacies participating in each Medco network.

In response, on August 9, 1995, Medco submitted its best and final offer. Defendants' Exh. 6. In so doing, Medco confirmed participation by the pharmacies listed in its original Proposal (including all of the defendants' pharmacies save NeighborCare). In an optimistic note, Medco added: "[h]istory has demonstrated that with the announcement of the State's commitment to utilize the chosen network, the small number of pharmacies not currently participating will quickly join yielding numbers similar to the CCN II." *Id.*

Around August 15, 1998, a committee of the Maryland Department of Budget and Fiscal Planning analyzed the offers submitted by the finalists. Deciding that Medco's MEN offered the most favorable terms, the committee recommended that Medco receive the award. Deposition of Patrick Renaud at 123.

In Maryland, the Board of Public Works ("BPW"), which includes the Governor, is the ultimate contracting authority. On September 13, 1995, the BPW met and approved the award to Medco. Among the three network choices, the State selected the MEN, with its reimbursement rate of AWP minus 15% plus $2.00. Governor Glendening expressed disappointment that the award could not be made to a local Maryland company. Nevertheless, Glendening voted for Medco because

of the significant savings to the State.[24] Defendants' Exh. 8.

Under the terms of the award, the Maryland Plan was scheduled to go "live" on January 1, 1996. This meant that Medco was contractually required, by that date, to assemble a network including at least 86.3% of Maryland pharmacies. Proposal at 118. Medco was ultimately unsuccessful, and more than half of Maryland retail pharmacies declined to join the MEN. Among the defendants, Rite Aid, Giant and NeighborCare corporately declined to participate, as did almost half of the 200 independent EPIC pharmacies.[25] Other prominent drugstore chains (e.g. CVS and Revco) declined to participate, but were not sued by Medco.

As January 1st drew near, the State became increasingly concerned about Medco's ability to assemble a network. At a BPW meeting on December 20, 1995, Governor Glendening issued Medco an "ultimatum," requiring Medco to provide a certified list of participating pharmacies within three days. *See* Defendants' Exh. 188, John W. Frece, *Md. Takes 2d Look at Medco Contract, Baltimore Sun,* December 21, 1995. Medco submitted a list to the State on December 26, 1995. The list, however, failed to satisfy Department of Budget and Fiscal Planning Secretary Marita Brown.[26] Accordingly, on December 27, 1995, the State rescinded the award and canceled the contract with Medco.[27] Medco claims that the defendants, led

---

**24.** Governor Glendening was concerned that further delays would continue the disadvantageous PCS contract already in effect.

**25.** As discussed further below, although EPIC as a network declined to join the Maryland Plan, the EPIC Board left individual member pharmacies free to join on their own.

**26.** On deposition, Secretary Brown said:

"Medco faxed us a list of pharmacies. It was inaccurate. I knew from just eyeballing it that it was not accurate. Some of the things I picked up were very, very simple things that anybody who looked at it would have picked up... They had things listed in the wrong counties... They had some things listed that I knew had gone out of business... They also had the pharmacy that Senator Bromwell

knew from his conversations with the pharmacists would not participate listed on the list. So I did not feel that the list was one that I could be—that I had any particular confidence in." Deposition of Marita Brown at 122–23.

Secretary Brown further testified that she terminated the contract with Medco "[b]ecause Medco could not prove to me with any assurances that they would have a network in place on January 1st that would in any way resemble the network that they represented to us in their bid." *Id.* at 129.

**27.** Upon canceling the contract with Medco, the State extended its prior contract with PCS. The PBM contract was re-bid in 1996, and won by PCS at a reimbursement rate of AWP minus 13%, plus a $2.50 fee for prescription drugs. This rate was measurably higher than either the MEN or the CCN III rates offered by Medco.

**456**

by Rite Aid, engaged in a conspiracy to sabotage Medco's network.

## II. Discussion: Antitrust Claims

■ Summary judgment standards apply equally to antitrust cases as to others. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 468, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317, 1322 (4th Cir.1995). The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In order to survive summary judgment, the non-moving party must present evidence from which a reasonable jury could return a verdict in its favor. *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The complexity of antitrust cases does not make summary judgment inappropriate. On the contrary, Rule 56 may be a particularly appropriate and useful tool for sorting out the "unusual entanglement of legal and factual issues frequently presented in antitrust cases ... [and] is favored as a mechanism to secure the just, speedy and inexpensive determination of a case, when its proper use can avoid the cost of trial." *Thompson Everett*, 57 F.3d at 1322 (citations omitted).

■ The Court must take care not to foreclose trial when the case presents genuinely disputed, material facts. Nevertheless, as the Fourth Circuit made clear in *Thompson Everett*, (i) "the mere existence of some disputed facts does not require that a case go to trial," and (ii) "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the *quality and quantity* of the evidence offered to create a question of fact must be adequate to support a jury verdict." *Id.* at 1323 (citations omitted) (emphasis added).[28]

■ Section 1 of the Sherman Act prohibits conspiracies in restraint of trade. 15 U.S.C. § 1. Consequently, "[a] violation of § 1 requires that two or more persons act in concert. Independent action is not proscribed, and a business has a right to deal, or refuse to deal, with whomever it likes." *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Laurel Sand & Gravel, Inc. v. CSX Transportation, Inc.*, 704 F.Supp. 1309, 1319 (D.Md., Niemeyer, J.), *aff'd* 924 F.2d 539 (4th Cir. 1991).

■ Direct evidence of a conspiracy is not required for a plaintiff to survive summary judgment on a Section 1 claim. An agreement to restrain trade may be inferred from circumstantial evidence alone. When, however, a case is based solely upon circumstantial evidence, and such evidence is ambiguous (meaning that it is equally consistent with an illegal agreement as with independent conduct), the plaintiff must produce additional evidence tending to exclude the possibility of legitimate conduct on the part of the defendants.

The Supreme Court announced this test in a 1984 decision, *Monsanto Co. v. Spray–Rite Service Corp.*[29] Monsanto, a manufacturer of pesticides, terminated Spray–Rite as a distributor. Spray–Rite sued under Section 1 of the Sherman Act, alleging that the termination resulted from a conspiracy between Monsanto and other distributors. In defending the suit, Monsanto acknowledged that other distributors had complained concerning

---

28. Thus, "if the evidence is merely colorable or not significantly probative, it may not be adequate to oppose entry of summary judgment... While we have recognized generally that when considering a motion for summary judgment, the district court must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion, we hasten to add that those inferences must, in every case, fall within the range of reasonable probability and *not be so tenuous as to amount to speculation or conjecture.*" *Id.* (citations omitted) (emphasis added).

29. 465 U.S. 752, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

Spray–Rite's low prices, but contended that the complaints had no bearing upon its decision. It terminated Spray–Rite for other reasons, primarily Spray–Rite's failure to comply with Monsanto's new marketing practices, Monsanto contended. 465 U.S. at 756–57, 104 S.Ct. 1464. The jury disagreed, finding that Monsanto had conspired with other distributors to terminate Spray–Rite, and awarded Spray–Rite treble damages. *Id.* at 758, 104 S.Ct. 1464.

The United States Court of Appeals for the Seventh Circuit affirmed, holding that an antitrust plaintiff survives a directed verdict motion by proving that "a manufacturer terminated a price-cutting distributor in response to or following complaints by other distributors." 465 U.S. at 758, 104 S.Ct. 1464. The Supreme Court also affirmed, but rejected the standard applied by the Seventh Circuit. Instead, the Supreme Court announced a more exacting test.

As the Supreme Court stated, Spray–Rite was required to prove a conscious commitment between Monsanto and another distributor to achieve an unlawful objective. 465 U.S. at 764, 104 S.Ct. 1464. In other words, the plaintiff was required to prove, by a preponderance of the evidence, that the termination resulted from a *conscious agreement* between Monsanto and another distributor. *Id.* 465 U.S. at 763, 104 S.Ct. 1464. The Supreme Court expressed concern that "[p]ermitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about 'in response to' complaints, could deter or penalize perfectly legitimate conduct ... inhibit management's exercise of independent business judgment and emasculate the terms of the statute." *Id.* at 763–64, 104 S.Ct. 1464. For this reason, "something more than evidence of complaints is needed." *Id.* at 763–64, 104 S.Ct. 1464.

The Supreme Court held that "there must be evidence that *tends to exclude the possibility of independent action* [on the part of the defendants]." 465 U.S. at 768, 104 S.Ct. 1464 (emphasis added). That is,

"There must be direct or circumstantial evidence that reasonably tends to prove that the [alleged conspirators] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.*

The *Monsanto* standard applies with equal force to the summary judgment stage of an antitrust case. In order to survive a motion for summary judgment, a Section 1 plaintiff must present sufficient evidence from which a reasonable jury could infer an unlawful agreement on the part of the defendants. Because the plaintiff's evidence must tend to exclude the possibility of independent action, "conduct [by defendants that is] as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., et al.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *citing Monsanto,* 465 U.S. at 764, 104 S.Ct. 1464.

This principle was illustrated *Laurel Sand & Gravel.*[30] The plaintiff, LSG, complained that CSX, a national railroad, would not permit a short line railroad to use CSX's tracks to haul LSG's sand and gravel to market. LSG relied upon evidence of earlier business dealings between CSX and Millville, a competitor of LSG's, as circumstantial evidence from which an overarching conspiracy could be inferred. 704 F.Supp. at 1317–18.

District (now Circuit) Judge Niemeyer, writing for this Court, found such evidence insufficient to survive summary judgment because it failed to exclude "the possibility that CSX's decision to deny trackage rights was a unilateral decision motivated by plausible business reasons." 704 F.Supp. at 1320. Judge Niemeyer explained that CSX's conduct was consistent with CSX's preexisting marketing plan, which intended short lines to be feeder railroads, and not substitutes, for CSX's transportation service. Under this plan, the short lines would bring cargo to CSX's tracks, and CSX would carry the freight to its destination.

The arrangement sought by LSG was contrary to CSX's plan because a short line

---

**30.** 704 F.Supp. 1309 (D.Md.1989), *aff'd* 924 F.2d 539 (4th Cir.1991).

railroad, and not CSX, would carry LSG's sand and gravel over CSX's track. In granting summary judgment, Judge Niemeyer reasoned that CSX's evidence was insufficient because "an explanation of CSX's decision to deny [the short line] trackage rights *did not require the assumption of an agreement* with Millville." *Id.* (emphasis added).

■ In evaluating Medco's evidence, the Court must give the plaintiff "the full benefit of [its] proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) (citations omitted); *Phillips v. Crown Central Petroleum Corp.,* 602 F.2d 616, 625 (4th Cir.1979). In other words, the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co.,* 370 U.S. at 699, 82 S.Ct. 1404.[31]

■ Quantity of evidence alone, however, is not sufficient to support an inference of conspiracy. *In Re Potash Antitrust Litigation,* 954 F.Supp. 1334, 1389 (D.Minn.1997) ("if no incident has probative value, all incidents taken together have no probative value"). In the end, the totality of the evidence considered must satisfy what amounts to a two-part test under Monsanto:

> "First, there must be evidence that the defendants had a conscious commitment to a common scheme designed to achieve an unlawful objective; and
>
> [S]econd, there must be evidence that tends to exclude the possibility of independent action or of a legitimate business purpose on the part of the defendants." *Laurel Sand & Gravel,* 924 F.2d at 542–43 (citations omitted).

**31.** To put it another way, "[a] court deciding whether to grant summary judgment should not view each piece of evidence in a vacuum. Seemingly innocent or ambiguous behavior can give rise to a reasonable inference of conspiracy in light of the background against which the behavior takes place. Evidence can take on added meaning when viewed in context with all the circumstances surrounding a dispute. Thus,

### a. Independent Conduct

■ Some have argued that in *Matsushita,*[32] the Supreme Court limited the applicability of the *Monsanto* test to cases in which the plaintiff's conspiracy theory is economically implausible. According to this position, to withstand a summary judgment motion, a plaintiff is required to produce evidence "tending to exclude the possibility of independent conduct" only when the economic theory relied upon by the plaintiff is impractical.

This Court rejects any such interpretation of *Matsushita.* The Supreme Court did not alter the *Monsanto* standard, but, instead, decided that the plaintiff's burden of production is higher when its conspiracy theory makes little economic sense. 475 U.S. at 587, 106 S.Ct. 1348. Conversely, the burden of coming forward with evidence "tending to exclude the possibility of independent conduct" is lesser when the plaintiff's theory is economically plausible. *Id.* at 588, 106 S.Ct. 1348.

The facts of *Matsushita* warrant a brief discussion. The plaintiffs were American manufacturers of television sets. They alleged that the defendants, competing Japanese manufacturers, conspired to set artificially high prices in Japan in order to subsidize a predatory pricing campaign in the United States. 475 U.S. at 578, 106 S.Ct. 1348. After the Third Circuit reversed the trial court's grant of summary judgment in favor of the defendants, the Supreme Court granted certiorari to determine, in part, whether the appeals court had applied the proper standard. *Id.* at 582, 106 S.Ct. 1348. The Supreme Court found that the Third Circuit misapplied the standard, reversed, and remanded the case for further proceedings. *Id.* at 598, 106 S.Ct. 1348.

while we must carefully determine what inferences reasonably may be drawn from each piece of evidence, we must make this determination in light of all of the evidence proffered by [the plaintiff]." *Apex Oil,* 822 F.2d at 255.

**32.** 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Reviewing the record, the Supreme Court focused on three closely related issues. First, the Court concluded that the plaintiffs' theory was economically unsound because the alleged conspiracy had lasted over twenty years without success (it being unlikely that the alleged conspirators would have accepted sustained losses over such a long period). *Id.* at 590–91, 106 S.Ct. 1348.

Second, the plaintiffs' case relied primarily on evidence of the defendants' price-cutting. The Court explained that this kind of evidence is inherently speculative, because price cutting is normal business behavior. *Id.* at 589–90, 106 S.Ct. 1348. The Court worried about permitting a jury to infer antitrust liability from conduct equally suggestive of a properly functioning market as it is of a conspiracy. *Id.*

Third, the Court reiterated the concern, expressed in *Monsanto*, that the threat of antitrust liability might chill legitimate pro-competitive conduct (i.e. price cutting). *Id.* at 593–94, 106 S.Ct. 1348. The Court worried that manufacturers might refrain from cutting prices for fear of being accused of collusive predatory behavior. *Id.*

*Matsushita* did not replace the *Monsanto* test. The *Matsushita* Court took pains to point out that evidence tending to exclude the possibility of independent conduct is required whether or not the plaintiff's theory is plausible. 475 U.S. at 597, n. 21, 106 S.Ct. 1348; *see Thompson–Everett*, 850 F.Supp. 470, 479, *aff'd*, 57 F.3d 1317 (4th Cir.1995). The extent to which the plaintiff's conspiracy theory is economically reasonable is simply a factor to be taken into consideration.[33] *See Apex Oil Co. v. Joseph DiMauro*, 822 F.2d 246, 253 (2d Cir.1987). When the plaintiff's conspiracy theory is economically plausible, the Court may require a lesser quantum of "tending to exclude" evidence. *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.*, 998 F.2d 1224, 1232 (3rd Cir.1993). Conversely, when the plaintiff's

theory is implausible, the Court may require a greater quantum of such evidence.

The same holds true for the other two related concerns expressed by the Supreme Court in *Matsushita*. The quantum of "tending to exclude" evidence required for the plaintiff to survive summary judgment varies with the risk that, under the circumstances of the case, the threat of antitrust liability may chill legitimate, pro-competitive conduct on the part of the alleged conspirators. The greater the risk of chilling permissible behavior, the more demanding the showing required of the plaintiff to survive summary judgment. *Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co., Inc.*, 998 F.2d 1224, 1232 (3rd Cir.1993).

In this case, Medco's theory is more plausible than the one advanced by the plaintiffs in *Matsushita*. Medco alleges that the defendants conspired to boycott the Maryland Plan because the Maryland Plan squeezed their profit margins. Through the group boycott, the defendants hoped that the Maryland Plan would be withdrawn and replaced with a new plan offering a better reimbursement rate. The boycott might cost the defendants short term profits. Unlike *Matsushita*, however, the conspiracy would not require the defendants to sustain long term losses. Because the Maryland Plan was open, the defendants could disband the boycott and join the Maryland Plan if, despite their efforts, the Plan successfully went live.

While Medco's economic theory is plausible, it does have significant weaknesses. Other major drugstore chains, notably CVS and Revco, also declined to participate in the Maryland Plan, but were not named as defendants. Medco neither alleges that these companies participated in the boycott, nor offers evidence that they did so. Thus, nonparticipation by a drugstore chain is as consistent with legitimate, independent decision making as it is with conspiracy.[34]

**33.** The *Matsushita* Court held that "if the factual context renders [the plaintiff's] claim implausible—if the claim is one that simply makes no economic sense—[the plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." 475 U.S. at 587, 106 S.Ct. 1348.

**34.** Medco concedes that it selected the defendants in this case because they, and not other Maryland pharmacies, were named in a December 21, 1995, advertisement placed by Rite Aid in the pages of *The Baltimore Sun* and *The Washington Post*.

Historically, the defendants sometimes participated, and sometimes elected not to participate in plans offering the same or a similar reimbursement rate as the MEN. Medco has offered no evidence that the defendants' non-participation in such networks was based upon collusion. Thus, non-participation in the MEN is, from the standpoint of history, as consistent with non-collusive behavior as it is with Medco's conspiracy theory.

Finally, the industry's reaction to the Maryland Plan demonstrates that the Plan was marginal economically. Of the 200 independent pharmacies in the EPIC network, approximately 100 joined the Maryland Plan, and approximately 100 did not. The same pattern held true for other independent pharmacies. Of the large chains, some declined, but others (including the entire Safeway [35] chain) joined. When a financial arrangement is at the economic margin, one would expect some competitors to accept the offer, and some to decline. Thus, the defendants' actions are economically unexceptional. Paraphrasing Judge Niemeyer's comment in *Laurel Sand & Gravel*, "[a]n explanation of [the defendants' conduct] does not require the assumption of an agreement [among them]." 704 F.Supp. at 1320.

In short, Medco's economic theory, while plausible, is not so compelling as to warrant a relaxation of Medco's burden of producing evidence tending to exclude the possibility of independent conduct on the part of the defendants.

The Court offered Medco time to investigate the relationship of other Maryland pharmacies to the alleged conspirators. Citing the high cost in effort and expense of such an endeavor, however, Medco declined to undertake it.

Thus, there is evidence that other large pharmacy chains also declined to participate, but there is no evidence or allegation that their decision was conspiratorial. At oral argument, plaintiff's counsel contended that other companies might or might not have conspired, and that, given the incompleteness of the record, no inference could be drawn either way. The Court disagrees: the absence of any allegation or proof of conspiracy by the other major drugstore chains can only lead the Court to infer that non-

## 1. Evidence of Independent Conduct

█ We shall now analyze the facts to determine whether Medco has come forward with sufficient evidence tending to exclude the possibility that the defendants reached their decisions independently.

### (i) Rite Aid

The State awarded the PBM contract to Medco on September 13, 1995. Shortly thereafter, in early October, 1995, Rite Aid informed Medco that it would not participate in the Maryland Plan. This decision was reached significantly earlier than the decisions of the other defendants. Also in early October, Rite Aid reiterated its position that it was not obligated to participate in Medco's "standing" EPN network.[36]

Rite Aid advances three reasons for its decision. First, joining would have been inconsistent with the bid protest lodged by Eagle (Rite Aid's subsidiary) and EPIC on September 18, 1995. In their protest, Eagle and EPIC contended that the award to Medco was arbitrary, capricious and unsupported by the evidence. Defendant's Exh. 128 at 4. The protesters complained that the State failed to verify the accuracy of Medco's Proposal and chose Medco merely because it was the low bidder. *Id.* at 5.

A focal point of the protest was the representation in Medco's Proposal that Rite Aid would participate in the MEN. This was a material falsehood, the protest contended, because Rite Aid had never agreed to join. According to Joel Feldman, a decision by Rite Aid to join Medco's Maryland Plan

participation could be an economically sensible, unilateral decision by a pharmacy chain.

**35.** Like Giant, Safeway is a chain of supermarket stores that also have a pharmacy section.

**36.** Medco contends that Rite Aid was part of the EPN, which offered the same reimbursement rate as the MEN. Consistently before and after the award of the PBM contract to Medco, however, Rite Aid took the position that it was not legally bound to participate in every plan serviced by the EPN. Feldman Dep. at 121–22, 320, 327. Medco concedes that no contract explicitly obligated Rite Aid to participate in the EPN, and that Rite Aid did not in fact participate in every plan serviced by the EPN.

would have undercut Eagle's bid protest. Feldman Dep. at 25–26.[37]

Second, Feldman, Rite Aid's PBM coordinator, frequently declined participation in a new network with the expectation that the PBM would be forced to offer better terms later. Because of Rite Aid's size and market clout, this strategy was frequently successful.

Third, the low reimbursement rate under the Maryland Plan made the Plan economically marginal.[38] Around the country, Rite Aid sometimes joined networks with rates comparable to the MEN, and sometimes Rite Aid did not. Facing a low reimbursement rate, Rite Aid's decision to join depended upon a number of factors, including (i) whether the plan was open or closed; (ii) the number of "lives" covered by the plan; (iii) the prominence of the plan sponsor; and (iv) Rite Aid's market share in the territory serviced by the plan. Feldman Decl. ¶¶ 4–8. With respect to the last point, Martin Grass, Rite Aid's Chairman and CEO, testified without contradiction that Rite Aid was more inclined to accept a lower reimbursement rate in places where the chain was attempting to build market share, whereas Rite Aid might reject a low rate in areas where it enjoyed a strong presence. Grass Dep. at 40.

Feldman testified that Rite Aid was also concerned about the industry trend toward lower and lower reimbursement rates. Feldman worried that accepting a low rate on a plan as large and prominent as the Maryland Plan might accelerate this race to the bottom. Feldman Dep. at 63–65.

In rebuttal, Medco claims that Eagle's bid protest was a sham, filed only to provide cover for the conspiracy. In support of this theory, Medco points out that Eagle's bid ranked low on the State's list. If Medco were knocked out, the award would not go to Eagle, but to another bidder. Defendants' Exh. 129 at 2–3. Moreover, the State denied the bid protest on November 14, 1995. Thus, Rite Aid could not rely legitimately on Eagle's bid protest as an excuse for non-participation after that date, Medco contends.

These arguments, however, do not cut clearly in Medco's favor. The fact remains that Eagle and EPIC did lodge a bid protest and pursued it vigorously. Eagle contested its low ranking, and challenged the assumptions used by the Department of Budget and Fiscal Planning to downgrade Eagle's bid. Although Eagle's bid protest was denied on November 14, 1995, Eagle appealed the denial on November 24, 1995, and the appeal was still pending when the state canceled Medco's contract. Defendants' Exh. 130. Thus, in essence, Medco offers only speculation to support a contention that the bid protest was conceived as a smoke screen to cover up or facilitate a conspiracy.

Medco's rebuttal to Rite Aid's other arguments is also weak. While Rite Aid had accepted plans with similar rates to the MEN, it had rejected others. Thus, a rejection of the MEN was not out of character. Medco concedes that Feldman frequently rejected plans in order to extract better terms for Rite Aid. In fact, Andrew Johnson of Medco testified on deposition that he did not take Feldman's initial "no," in early October, 1995, as a final decision. According to Johnson, a "no, no, no" from Feldman did not mean "no," and Johnson fully expected Rite Aid to join the network later. Johnson Dep. at 152.

Moreover, there was no pressure on Rite Aid to join at the threshold. Because the Maryland Plan was open, Rite Aid would pay no penalty for holding out; the window for joining would never slam shut.

---

37. As noted above, Feldman was both Rite Aid's Senior Vice–President of Managed Care and President of Eagle Managed Care.

38. It would be evidence of collusion if Rite Aid acted against economic self-interest by rejecting a plan that was clearly profitable. It would also be evidence of collusion if Rite Aid rejected a reimbursement rate that it had consistently accepted elsewhere. Such is not the case here. In situations throughout the country, under circumstances which Medco does not contend were tainted by conspiracy, Rite Aid has accepted some plans with rates similar to the MEN and rejected others. Thus, Rite Aid's decision to reject the Maryland Plan was neither economically irrational, nor a break with history. These factors point to independent action rather than collusion.

(ii) Giant

James Wirth, Giant's Assistant Director of Managed Care Programs, was responsible for analyzing the profitability of pharmacy networks. The ultimate decision whether to join a particular network, however, rested with the company's Chairman, President, and CEO, Peter Manos. Manos Dep. at 54.

The award to Medco was announced on September 13, 1995. On September 15th, Wirth prepared a memorandum for his immediate superiors, Vice–President of Pharmacy Operations Russell Fair and Pharmacy Controller Jay Cohen. Defendants' Exh. 139. According to Wirth's calculations, the shift from the existing PCS plan to Medco's MEN would reduce Giant's annual profits by more than $1.2 million. Defendants' Exhs. 139, 142.[39] Wirth's memorandum also cautioned that Medco's plan was "completely open," and would include a mail order component. Defendants' Exh. 139.

On deposition, Wirth testified that as early as 1994, Russell Fair, Jay Cohen and he had begun to worry about the profitability of certain networks. Wirth Dep. at 89. Before, during, and after 1995 Giant had abandoned a number of plans with rates comparable to the MEN. Defendant's Exhs. 89–95. Wirth, Fair, and Cohen all considered the MEN to be a part of a disquieting trend towards unprofitability.

On September 25, 1995, nearly two weeks after the announcement of the award to Medco, Wirth told Medco's Director of Pharmacy Relations, Robert Bertani, that Giant did not anticipate participating in the Maryland Plan. Wirth Dep. at 204. On October 13, 1995, Wirth spoke with Bertani again, confirming that the MEN rate was too low for Giant, and asking Bertani not to list Giant among the participating pharmacies. Id. at 257. On November 20th, Bertani called Wirth to ask Giant to make a final decision by November 22, 1995. Wirth Dep. 317.

On November 22nd, Fair and Wirth met to formulate a recommendation to Giant's upper management. Id. 326–28. After talking it

over, Fair concluded that participation would be against Giant's economic interests. He instructed Wirth to advise Medco of this decision. Later that day, Wirth phoned Bertani and advised him that (i) Fair would recommend against participation, but (ii) upper management might overrule Fair based on overall strategic considerations. Id. at 326–29.

On December 6, 1995, Fair submitted a memorandum to Giant's top management: Peter Manos (Chairman, President, and CEO), and David Sykes (CFO and Senior Vice–President of Finance). Defendants' Exh. 156. The general topic of the memorandum was the profitability of Giant's participation in PBM networks. Fair advised his superiors that on "[a]ll plans with reimbursement rates of AWP − 15% + $2 .00[, Medco's MEN rate,] or less we are losing money on incremental costs—cash discount not included." Id.

In his memorandum, Fair also predicted that the shift to the Maryland Plan would reduce Giant's reimbursements by $1.25 million a year. Fair added that he and Wirth were "hanging tough on accepting contract, but need advice before January 1." Id.

Fair moved to a discussion of the Federal Employees plan, which was also administered by Medco. Fair warned that the Federal Plan's mail order service was underpricing Giant stores by about 20%, causing Giant to lose about 225,485 prescriptions and over $10.3 million in revenues per year. Id. Fair closed with the question: "[h]ow much are we willing to lose before saying no?" Id.

On December 7, 1995, Wirth, Fair, and Cohen met face-to-face with Medco's Bertani. The three informed Bertani that Giant's upper management had decided not to participate in the Maryland Plan at the MEN rate. Wirth Dep. at 352. Wirth confirmed Giant's position in a letter to Bertani dated December 8, 1995. Defendants' Exh. 157. The letter also advised Bertani that Giant was dropping out of Medco's Exclusive Provider

---

**39.** Giant earned an annual profit of $1,178,632 under the PCS plan. This would turn into a loss of $72,000 under the MEN rate. Id.

Network.[40] Wirth added that Giant would "gladly reconsider [its] decisions if the reimbursement rates increase to a reasonable level." *Id.*

In opposing summary judgment, Medco contends that Giant's profitability analysis is disingenuous, and that the company would have made money by joining the Maryland Plan. As Medco points out, Wirth's projections do not take into account "ancillary" sales and cash discounts. An ancillary sale occurs when a customer, drawn into a pharmacy to fill a prescription, purchases groceries, cosmetics, or some other item. A low profit margin, or even a loss, in pharmaceutical sales, may be more than offset by profits from ancillary sales. Medco also point out that, in 1995, Giant participated in several pharmacy networks offering comparable or lower rates than the Maryland Plan. Plaintiff's Exh. 2 at 33–35; Plaintiff's Exh. 3 at 11–12.

Although Medco may disagree with Giant's accounting practices, it has produced no evidence that Giant's cost analyses were pretextual, or that they were written as part of a cover-up. Nothing in the record suggests that either the Wirth or the Fair memoranda, both of which were written to their superiors, were authored to provide Giant with "cover" in the event of future litigation.

Also, Giant produced *pro forma* analyses prepared both before and after the fall of 1995. These reveal a consistent methodology; Giant never took ancillary sales and cash discounts into consideration when evaluating profitability.

Moreover, the record demonstrates that, beginning in 1994, Giant had dropped a number of plans with rates comparable to the Maryland Plan. It is only reasonable to infer that Giant did so because it considered the plans unprofitable despite the potential for ancillary sales.[41]

Medco next focuses on the events of late December, 1995. On December 26th, pressured by the State's ultimatum, Medco increased its efforts to secure Giant's participation. Bertani and Richard Mountjoy, Medco's Vice–President of Pharmacy Network Management, telephoned Wirth and Fair. They offered Giant the option of joining the Maryland Plan at the CCN III reimbursement rate (AWP minus 13% plus $2.00). At that time, Giant serviced a number of plans at the CCN III rate. Although Bertani could not recall precisely what Wirth and Fair said, he interpreted their response as an agreement to participate at the increased rate. Bertani Deposition at 103–106.

Later that day, the State contacted Fair to inquire whether Giant had, in fact, agreed to participate in the Maryland Plan at the CCN III rate. Fair responded that he was "not sure." Deposition of Patrick Renaud at 501.

Medco claims that Fair equivocated for the sole purpose of undercutting the State's confidence in Medco's network. The Court cannot agree that the evidence fairly supports such an inference. There is no evidence that Giant had made a corporate decision to participate in the Maryland Plan at the CCN III rate. There is no evidence that Bertani's inquiry ever reached Manos, much less that Manos had signed off. Under such circumstances, Fair's statement that he was "not sure" whether Giant would participate at the CCN III rate would have been an accurate reflection of the state of affairs on December 26, 1995.

Moreover, Bertani has no clear recollection of the December 26th conversation, or that Fair and Wirth unequivocally assented to the CCN III rate. On deposition, Bertani could only recall that earlier in December Fair had indicated that Giant would participate at the higher rate of "minus 12 or minus 13 off AWP plus $4." Bertani Dep. at 105.

40. In deposition testimony, Wirth explained that Giant's decision not to participate in the Exclusive Provider Network ("EPN") was in response to Medco's practice of moving plan sponsors into the EPN from plans with higher reimbursement rates without providing notice of the shift to Giant. Wirth Dep. at 356–57.

41. While Medco's expert reports may fault Giant's methodology, Giant's *pro forma* analyses are reasonable, and employ the same analytical methodology from year to year. Nothing in the record suggests that these analyses were fabricated for litigation purposes.

Similarly equivocal is a memorandum that Bertani wrote to Wirth, confirming the December 26th conversation. Plaintiff's Exh. 104. Bertani wrote that Wirth agreed (1) to ask Fair about extending the deadline on which Giant would cease to participate in Medco's EPN; and (2) "to continue to participate in the PAID Coordinated Care Network, Level 3 [the CCN III] serving all current clients as well as those new clients beginning January 1, 1996." *Id.* Bertani's memorandum neither mentions the Maryland Plan, nor provides any indication of Giant's agreement to participate in it.[42]

#### (iii) EPIC

As the coordinator for a network of around 200 independent pharmacies in Maryland, the EPIC Board faced the following choices: it could join the Maryland Plan as a network, thereby binding each individual member pharmacy to participate; or it could decline to join as a network, thereby leaving each individual member pharmacy free to make an individual decision.[43] The EPIC Board chose the latter path. More than 100 member pharmacies, however, elected to participate. Defendants' Exhs. 177, 178.

Medco argues that the EPIC Board's refusal to join as a network supports an inference of conspiracy. The record, however, clearly supports a contrary inference of independent action.

The EPIC Board first learned of the Maryland Plan's reimbursement rate on September 21, 1995. On that date, EPIC Board President William Popomaronis attended a "debriefing" meeting at which Maryland's Patrick Renaud explained the reasons for the

State's rejection of the Eagle/EPIC bid. Popomaronis's reaction was prompt and forceful. In a strongly worded letter to Governor Glendening, dated September 26, 1995, Popomaronis complained that independent local pharmacies had been "severely injured by this award." Defendants' Exh. 165 at 3.

Among other criticisms, Popomaronis noted that the mail order feature of the Maryland Plan would divert profits from local pharmacies to New Jersey-based Medco. *Id.* Popomaronis pointed out that, under the new reimbursement rate, EPIC pharmacies' profits would be slashed by 59 percent on the average $30.00 prescription. *Id.* at 4. Popomaronis also complained that the joint Eagle/EPIC bid had been unfairly downgraded. He urged Governor Glendening to reverse course. *Id.* at 3–4.

In late October, 1995, Medco's Robert Bertani and Andrew Johnson contacted Patrick Berryman, a broker representing EPIC. Their purpose was to inquire whether EPIC would participate in the Medco Plan. Berryman replied that he had standing authority to bind EPIC to networks offering a rate of AWP minus 13% plus $2.00, or higher. Because the MEN reimbursement rate fell below this threshold, Berryman stated that the full EPIC Board would have to decide whether EPIC should participate. Deposition of Patrick Berryman, at 50–51.

In anticipation of a December 4, 1995, meeting of the EPIC Board, Bertani supplied Berryman with additional information throughout the month of November. On December 4, 1995, the EPIC Board met by conference call. After discussion, the Board

---

**42.** As all parties concede, the Maryland Plan was not to be serviced by any standing network. None of the defendants were contractually obligated to take part in the Maryland Plan and, at the express request of the State, the Maryland Plan was open. Thus, a commitment by Wirth to participate in the CCN III simply does not address Giant's participation in the Maryland Plan.

Medco argues that, based on Giant's own analyses, participation at the CCN III rate would have been profitable for Giant. Medco concludes that Giant's refusal to join the Plan even at the CCN III rate is evidence of an improper · motive. Again, the Court cannot agree. There is no evidence in the record of any communications between Giant and any other defendants at any

time following Medco's offer of the higher CCN III reimbursement rate to Giant. The inference of collusion sought by Medco is thus highly conjectural.

**43.** The EPIC network's Pharmacy Participation Agreement provides that a majority of the EPIC Board of Directors must be "independent," in that they must not own any pharmacies, and that a majority of the independent directors is required to decide whether or not EPIC will accept a contract. In addition, the agreement provides that while the Board can bind all member pharmacies to participate in a particular network, it cannot prevent member pharmacies from participating in networks that the Board elects not to join. Defendants' Exh. 98.

unanimously rejected participation "based on negative economic impact on Network pharmacies and a history of increasing slow payment for services rendered by [Medco]." Minutes of December 4, 1995, EPIC Board meeting, Defendants' Exh. 171.[44] The Board also directed Berryman to ask Medco to "reconsider reimbursement level." *Id.* Contemplating that individual member pharmacies might wish to join despite the low reimbursement rate, the Board expressly agreed to assist Medco in contacting EPIC pharmacies. The Board directed Berryman to inform Medco of EPIC's "offer to act as messenger to bring [Medco's] contract to those members asking to participate." *Id.*

When informed of this decision, Medco's Bertani requested an opportunity to address the EPIC Board personally. The Board agreed, and a conference call was set up for December 8, 1995.

During the call, Bertani explained the benefits of the Maryland Plan, emphasizing his belief that reduced profit margins would be more than offset by increases in customer volume. Berryman Dep. at 379–80. Bertani forecast that only about fifty percent of Maryland pharmacies would participate, meaning that EPIC pharmacies would be able to pick up market share. *Id.* at 382–83. In response to Bertani's remarks, Board members expressed their concern that, because the network was open, any increases in market share might be wiped out by large pharmacy chains joining late.

After December 8th, Bertani requested yet another opportunity to pitch the EPIC Board. Again EPIC agreed. In a December 14, 1995, conference call, Bertani, joined by Mountjoy, addressed the full EPIC Board. At the end of Bertani's presentation, the Board reaffirmed its decision to decline participation as a group. The Board, however, specifically advised Bertani and Mountjoy that Medco was free to contact each EPIC pharmacy separately. Deposition of Richard

Mountjoy, at 250. The Board also said that the entire EPIC network would participate at the CCN II rate of AWP minus 12% plus $2.00. Berryman Dep. at 413.

Medco contends that EPIC's concern over the reimbursement rate is specious. Medco asserts this, in principal part, because EPIC was at that time participating in one of Medco's standing networks (the EPN), which reimbursed at the same rate as the Maryland Plan. Thus, EPIC was rejecting a rate that it had previously accepted.

The evidence unmistakably shows, however, that EPIC's concern over the reimbursement rate was not a make-weight argument. EPIC voiced strong objection to the Maryland Plan's reimbursement rate as soon as the award was announced. Although Popomaronis's letter to Governor Glendening advances many criticisms of the award to Medco, the low reimbursement rate was prominent among his concerns. The EPIC Board pointed to the reimbursement rate as the prime reason for rejecting the Maryland Plan on December 4, 1995. During Bertani's subsequent conference calls with the Board, the Board consistently and specifically pointed to the reimbursement rate, coupled with the openness of the MEN, as the prime reason for declining participation.

It is also clear that EPIC never considered the Maryland Plan and the standing EPN to be equivalent. In his October, 1995, conversation with Berryman, Bertani argued that the Maryland Plan was comparable to the EPN. In response, Berryman adverted to the crucial distinction between the two networks. The EPN was a closed network, enabling community pharmacies to gain market share. As Berryman explained, no such increase could be guaranteed under the Maryland Plan. Berryman dep. at 379–81. Following the December 14th conference call, Berryman reiterated these points in a memorandum to Bertani. Plaintiff's Exh. 60.[45]

---

**44.** As of 1995, administrative difficulties between EPIC and Medco on plans other than the Maryland Plan had led to delays in the processing of revenues to individual pharmacies. This problem was compounded by the fact that, when EPIC participated in a network as a group, it caused further delays by acting as middleman between the plan administrator and the individu-

al pharmacists. Popomaronis Dep. at 240–42; R.S. Beardsley Aff., ¶3B; M. Berryman Aff., ¶3C; C. Bradshaw, ¶3D; J. Yospe Aff., ¶3D.

**45.** When EPIC was formed, PBMs lacked confidence in the Board's ability to coordinate the member pharmacies. Accordingly, EPIC met initial resistance in its efforts to gain entry into

As Medco concedes, EPIC cooperated fully with Medco's efforts to solicit the individual pharmacists. There is no evidence that EPIC made any attempt to dissuade individual pharmacies from joining. Slightly more than half of the EPIC pharmacists did join, and roughly the same proportion declined. This "plebiscite" is strong evidence that the individual pharmacists concluded that the Maryland Plan was of equivocal economic value.

#### (iv) NeighborCare

NeighborCare's decision making is centralized in the company's two owners, President and CEO Michael Bronfein, and Executive Vice–President Stanton Ades. As discussed, NeighborCare's 20 pharmacies, all of which are located in health care facilities, concentrate on sales of prescription medicines. Throughout its history, NeighborCare has never participated at a reimbursement rate as low as the Maryland Plan's. For this reason, Medco, when submitting its bid to the state, did not include NeighborCare pharmacies as part of its proposed network. On deposition, Medco's Bertani testified that he had no hope that NeighborCare would join the Plan at the MEN rate. Bertani Dep. at 737.

Both Bronfein and Ades testified that they learned the details of the Maryland Plan's reimbursement rate in early October, 1995, and decided at once that NeighborCare would not participate. Deposition of Michael G. Bronfein at 83; Deposition of Stanton Ades at 150. Both men also testified that NeighborCare has a longstanding policy of rejecting any networks offering reimbursement rates that fall below the company's profitability threshold, and that the Maryland Plan was clearly such a network. Bronfein Dep. at 62, 74, and 82–83; Ades Dep. at 150.

Despite this, Medco claims that NeighborCare's rejection was pretextual and that, absent a conspiracy, NeighborCare would have joined. As evidence of this, Medco offers the fact that sometime after mid–October, 1995, NeighborCare requested more information from Medco about the Maryland Plan. Medco also points to a December 4, 1995, memorandum from Ades to Bertani, in which Ades said that NeighborCare was conducting a "thorough review" of the Maryland Plan. Plaintiff's Exh. 92. Had the reimbursement rate been prohibitively low, Ades and Bronfein would have rejected the Plan out of hand instead of requesting more information, Medco argues.

Medco also notes that, in 1992, NeighborCare had initially rejected the then-new PCS plan because of an allegedly unprofitable reimbursement rate. A few months after the PCS plan went live, however, NeighborCare was forced to join in order to avoid losing customer volume. Medco contends that NeighborCare knew from past experience that it could not afford to forgo a plan covering State employees. When approached by Bertani, NeighborCare equivocated instead of joining because of its conspiracy with the other defendants.

Medco's conspiracy theory cannot withstand serious scrutiny. On summary judgment, NeighborCare, without opposition, pointed to many networks, with reimbursement rates equal to or better than the Maryland Plan, that NeighborCare had declined to join. Throughout its history, NeighborCare had never joined a network with as low a rate as the Maryland Plan. The 1992 PCS network offered a reimbursement rate of AWP minus 10% plus $3.75, a substantially higher rate than the Maryland Plan. Even so, NeighborCare joined the PCS network only after it had gone live.

Stanton Ades testified without opposition that, sometime after October 3, 1995, Bertani telephoned Ades to request an opportunity to explain to NeighborCare the benefits of participation in the Maryland Plan. Ades Dep. at 152. Ades testified that he interpreted Bertani's overture as a potential opportunity to obtain a higher reimbursement rate for

---

networks. To foster credibility, the Board initially was not particularly choosy concerning which networks to join. The Board's attitude, however, changed over time. EPIC's counsel explained, without objection, that, as the EPIC concept gained market acceptance, the Board was becoming increasingly selective. By 1995, EPIC was rejecting networks that it would have accepted in prior years.

NeighborCare. *Id.* Accordingly, Ades requested further information from Medco. There is no evidence of any kind that Ades was evaluating the economics of the Maryland Plan before he was invited to do so by Bertani. There is no direct evidence that Ades discussed his thinking with any of the other defendants. None of Medco's circumstantial evidence tends to exclude the possibility of independent action on the part of NeighborCare.

### b. Parallel Conduct

 In the absence of direct evidence, the existence of an antitrust conspiracy may be inferred from evidence of "conscious parallelism," or a "pattern of uniform conduct among competitors." *Thompson Everett,* 850 F.Supp. at 480 (citations omitted). Evidence of parallel conduct alone, however, is insufficient to support an inference of a conscious commitment to a common scheme designed to achieve an unlawful objective. In order for a plaintiff to survive summary judgment, evidence of parallel conduct must be accompanied by further evidence tending to disprove the possibility of independent action. *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2nd Cir.1987).

In this case, the defendants' conduct was parallel in the sense that all four declined to participate in the Maryland Plan. The manner and timing of their decisions, however, was disparate rather than parallel. Rite Aid's decision was strong and immediate.[46] Giant, by contrast, attempted from the beginning to obtain a better rate from Medco. Giant definitively rejected the Maryland Plan

only on December 8, 1995.[47] EPIC cooperated with Medco's efforts to sign up individual pharmacies, and more than half of EPIC's membership joined the Maryland Plan. NeighborCare made an immediate decision not to participate, and Medco did not attempt to change NeighborCare's mind until late in the game.

The evidentiary value of the defendants' parallel decisions is further undercut by the fact that other Maryland pharmacy chains, such as CVS and Revco, also declined to participate in the Maryland Plan. Medco has not sued these chains, and makes no allegations that they were part of the alleged conspiracy.

Medco concedes that its choice of whom to sue was based on the fact that the defendants, and no other retail pharmacists, were mentioned in a December 21, 1995, advertisement that Rite Aid placed in *The Baltimore Sun* and *The Washington Post.* There is no evidence, however, that anyone other than Rite Aid was behind the advertisement. On December 19, 1995, an article appeared in the *Baltimore Sun* announcing that "three large chains and a network of independent pharmacies said yesterday that they are refusing to participate in the state employee's drug plan." Plaintiff's Exh. 95, M. William Salganik, *4 Retail Groups Refuse to Accept State Drug Plan, Baltimore Sun,* Dec. 19, 1995. The article went on to explain that "after January 1, [1996,] 92,000 state employees and retirees won't be able to get their prescription benefit cards honored at Rite Aid, Giant, or NeighborCare. The Epic

**46.** In early October, 1995, as soon as it learned of the award to Medco, Rite Aid (i) announced to Medco that it would not participate in the Maryland Plan; (ii) contested its obligation to participate in Medco's EPN; and (iii) through Eagle, filed a bid protest. Rite Aid never reconsidered its refusal to participate.

**47.** As discussed above, in late September, Giant's Wirth spoke several times to Medco's Bertani, informing him that Giant would probably decline participation because the MEN reimbursement rate was unacceptable. Wirth Dep. 224–25. Wirth told Bertani that Giant would consider a rate of AWP minus 15% plus $3.00, but Bertani declined to up the ante. Defendants' Exh. 150.
Pending Giant's final decision, on October 13, 1995, Wirth asked Bertani not to list Giant in

Medco's directory of pharmacies participating in the Maryland Plan. Wirth Dep. at 257. On November 22, 1995 Russell Fair, Giant Vice–President of Pharmacy Operations, decided to recommend to his superiors that Giant reject the Plan. When Wirth communicated the decision to Bertani, Bertani asked to meet with Fair in person. At a meeting on December 7, 1995, Bertani tried unsuccessfully to obtain Giant's agreement to participate. On December 8, 1995, Wirth officially notified Bertani of Giant's rejection of the Plan at the MEN rate. Defendants' Exh. 157. In late December, Medco offered Giant the CCN III rate. The State, however, canceled Medco's contract before Giant had accepted or rejected the new rate.

pharmacy network ... has also declined to participate." *Id.*

On the same day, December 19th, Rite Aid's Feldman and lobbyist Gary Alexander met with the company's CEO, Martin Grass. At that time, Rite Aid, through Alexander, was actively lobbying the State to withdraw the award to Medco. Grass testified that, because the *Sun* article mentioned Rite Aid, Grass felt an obligation to explain to his Maryland employee customers why Rite Aid would not be filling their prescriptions after January 1, 1996. Grass Dep. at 150, 170, 215. Also, Grass wished to make a public statement that would keep up the pressure on the State's award to Medco. Feldman Dep. at 42–43. Feldman suggested that Rite Aid hold a press conference to apologize to customers for any inconvenience, and to explain that Medco had falsely promised that Rite Aid would participate in the Maryland Plan. *Id.* at 43–44. Grass, however, preferred a newspaper advertisement. *Id.* at 44. Accordingly, Grass prepared the text of an advertisement, which appeared on the pages of the Sun and the *Washington Post* on December 21st.[48]

During oral argument, Medco conceded that it chose to sue the defendants because they were mentioned in the advertisement.

Certainly the advertisement can raise suspicions. Upon examination, however, there is little in the text or the circumstances of the publication to infer the existence of a group boycott.

There is no evidence to suggest that Rite Aid planted the December 19th *Sun* article, or that Rite Aid solicited the consent or input of any of the defendants in writing, publishing, or paying for the advertisement. Medco presents no evidence of significant communications between the defendants in the period between the publication of the *Sun* article and the appearance of the advertisement. Although Medco points to a number of contacts among some of the defendants toward the end of December, virtually all such communications took place after the advertisement had appeared. Under such circumstances, there is no basis to infer any collaboration among the defendants.

In support of its conspiracy theory, Medco contends that the defendants' reasons for declining participation in the Maryland Plan were similar. Medco argues that these reasons originated with Rite Aid and were parroted by the other defendants. While superficially appealing, this argument does not withstand scrutiny.

**48.** In full, the advertising read as follows:

"Maryland State Employees: Do you know why Rite Aid Drugstores, Giant Food & Drug, NeighborCare Pharmacy 200 Independent Pharmacies will stop filling your prescriptions on January 1, 1996? According to an article in the Baltimore Sun December 19, 1995, the State of Maryland has contracted with Medco, a mail order middleman to provide all pharmacy management services to Maryland State employees. This new middleman has decided to unilaterally decrease to below our cost the price it will pay your drugstore for your prescriptions. Why? Because Medco, owned by Merck, a large drug manufacturer, eventually will attempt to divert your prescriptions from being dispensed at convenient retail pharmacies, in which you choose where to shop, into a mail order program in which only Medco can fill your prescriptions. They did this to the Federal Employees. You might be next.
"How can that happen? Today, pharmaceutical manufacturers have been selling medicines to mail order companies at cheaper prices than they offer community pharmacies. Therefore, community pharmacies, whether chain stores or independently owned, may be priced out of business.

"So ... the drugstores are suddenly refusing to fill prescriptions at a loss. Do you blame us? If the drugstores are forced out of business by the mail order middleman, then what do you think will happen to prices and service? It will be awfully inconvenient for you if you have to wait for the mailman to bring your medicine. You know what happens when there is no competition.
"Rite Aid drugstores have been filling your prescriptions in 179 stores throughout Maryland for many years. We are the largest pharmacy provider in the state of Maryland. We provide convenient locations open seven days a week, and in Baltimore 24 hour service. In addition, direct patient counseling is offered face to face to ensure that all of our customers get the best when it comes to prescription services.
"If you want a cost effective retail network with convenient service and direct patient consultation, contact the following:
"Governor Parris Glendening at 410–974–3901, or Fax 410–974–3275. AFCSME Council 92 at 410–547–1515. Maryland Classified Employees Association at 410–287–8800.
"Paid for by Rite Aid [logo]." Plaintiff's Exh. 96.

As described above, the defendants' rejections of the Maryland Plan differed considerably in manner and timing. In addition, Medco overlooks that some issues, such as increasingly low reimbursement rates, profit margin erosion, and the threat from mail order services, are common and recurring complaints in the pharmacy community throughout the country. That each defendant pointed to some or all of these reasons for rejecting the Maryland Plan adds little weight to Medco's charge of conspiracy. In short, the record simply does not show the kind of parallel conduct among the defendants that would tend to exclude the possibility of independent action.

### c. Plus Factors

When a case involves parallel conduct among the defendants, the existence of a conspiracy may be inferred from the presence of a number of "plus factors," such as the opportunity for collusion, a common motive to conspire, or a high level of interfirm communications. *Apex Oil*, 822 F.2d at 254; *Thompson Everett*, 850 F.Supp. at 480.[49] The mere existence of plus factors, however, is not necessarily sufficient for the plaintiff to survive summary judgment. For a case to reach the jury, the plus factors evidence must tend to exclude the possibility of independent action.[50] In other words,

"such plus factors may not necessarily lead to an inference of conspiracy. For example, such factors in a particular case could lead to an equally plausible inference of mere interdependent behavior, i.e., actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of tacit agreement. In such a case, a court might find it difficult to hold that the parallel acts tend to exclude the possibility of independent action." *Apex Oil*, 822 F.2d at 254 (citations omitted).[51]

The principal plus factors Medco relies upon are bursts of interfirm communications among the defendants (and other pharmacists not sued by Medco), and the opportunity to conspire afforded by these contacts.

Taken in the context of the entire record, these factors do not tend to exclude the possibility of independent conduct. In many industries, there is little legitimate reason for competitors to have systematic contacts with each other. Such was not the case with the Maryland pharmaceutical industry in the fall of 1995. During that time, as discussed above, Maryland pharmacies, through their lobbyists and trade associations, were engaged in a number of industry-wide lobbying efforts, including pushing for fair pricing legislation and the Medicaid "carve-out."[52]

**49.** Other plus factors include "evidence showing [that] the parties would benefit only through concerted action, and evidence showing [that] legitimate business reasons should have motivated independent action." *Thompson Everett*, 850 F.Supp. at 480 (citations omitted). Because these elements are discussed elsewhere in this opinion, the Court need not address them here.

**50.** Conscious parallelism, without more, does not violate the antitrust laws. Conscious parallelism occurs when a company predicates a decision upon the conduct of its competitors. For example, a manufacturer might announce a price increase after learning that a competitor has raised its prices. In such a case, the price increases, while parallel and close in time, are illegal only if they resulted from an agreement, whether explicit or tacit. The present case is not one of admitted conscious parallelism, because the defendants deny that they based their own decisions upon the actions of their competitors.

**51.** Several courts have granted antitrust defendants summary judgment in the presence of plus factors. *See, e.g., Wallace v. Bank of Bartlett*, 55

F.3d 1166 (6th Cir.1995) (exchange of price information and a common motive to conspire did not tend to exclude possibility of independent conduct); *Nurse Midwifery Associates v. Hibbett*, 918 F.2d 605 (6th Cir.1990) (motive and opportunity to conspire insufficient to support inference of antitrust conspiracy); *In Re Potash Antitrust Litigation*, 954 F.Supp. 1334 (D.Minn.1997) (opportunity and motive to conspire, acts apparently against economic self-interest, and interfirm communications including the exchange of price information did not tend to exclude possibility of independent action); *Re/Max International, Inc. v. Realty One, Inc.*, 924 F.Supp. 1474 (N.D.Ohio 1996) (parallel pricing conduct insufficient to support inference of conspiracy).

**52.** Some of the defendants were also lobbying against the Maryland Plan directly. On October 3, 1995, for example, EPIC President William Popomaronis and Vice President James Miller (who are also, respectively, President and Executive Director of the association Maryland Professional Pharmacies, Inc.) met with Secretary Brown to discuss the negative impact of the Maryland Plan on community pharmacies.

The record also discloses that the competing defendants had legitimate business dealings unrelated to the Maryland Plan. To cite but two examples, Rite Aid/Eagle and EPIC collaborated on a bid and a bid protest. Similarly, Rite Aid/Eagle was negotiating to persuade Giant to join a PBM network (the Pharmacy Card, Inc., or "PCI" network) that Rite Aid/Eagle had recently purchased.[53]

In *Matsushita,* the Supreme Court voiced concern that legitimate business conduct would be chilled if an inference of conspiracy could be based upon such conduct. The Court addressed this problem by holding that a plaintiff's case may withstand summary judgment only if the plus factors, analyzed in conjunction with all the other evidence, tend to exclude the possibility of independent conduct on the part of the defendants. 475 U.S. at 588, 106 S.Ct. 1348.

The proper role of the *Noerr–Pennington* doctrine also deserves brief comment. Under that doctrine, horizontal competitors may join together to lobby the government. The First Amendment shields this joint lobbying from antitrust liability, even when the competitors are seeking government action that would eliminate competition or exclude competitors.[54] The *Noerr–Pennington* doctrine protects joint efforts at lobbying all branches of government, including administrative agencies and courts. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965);

and *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The doctrine does not, however, extend to horizontal boycotts among competing sellers designed to extract higher prices from the government acting as purchaser. *FTC v. Superior Court Trial Lawyers Assn.,* 493 U.S. 411, 424–25, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990).[55]

With this in mind, the Court shall now deal with Medco's plus factor evidence. In their briefs, the parties have devoted dozens of pages to an analysis of the interfirm contacts. The Court will discuss the contacts upon which Medco places principal reliance.

Medco has produced evidence of bursts of communications between some or all of the defendants at several points during the second half of 1995. For some of the meetings and telephone calls, Medco provides evidence that the award of the Maryland Plan to Medco was discussed at least tangentially. For the great majority of the contacts, however, there is no evidence of content. All that exists is the bare record that a telephone call was made. Despite this, Medco argues that the timing and quantity of these contacts supports an inference of conspiracy.

The Court finds that Medco's evidence of plus factors does not tend to exclude the possibility of independent conduct on the part of the defendants. Because of the large number of contacts, the Court will consider them in groups.

First, Medco points to a number of meetings and telephone conference calls in the month of September, 1995.[56] Most of these

---

Brown Dep. 56–58. Popomaronis also wrote letters to Governor Glendening on September 26, October 18, October 27, and November 22, 1995. Defendants' Exh. 165–68. NeighborCare's President and CEO Michael Bronfein met with Governor Glendening on October 23, 1995.

53. Giant withdrew from the PCI program on June 22, 1995, effective September 10, 1995. Defendant's Exh. 89. The parties agree that Giant and Rite Aid subsequently continued to negotiate over the terms of the program and that Giant eventually returned to the program on November 17, 1995.

54. For example, under *Noerr–Pennington,* it would have been legitimate for the defendants in

this case to have joined together to request the State to cancel the award to Medco.

55. Unless the evidence is unduly prejudicial to the defendants, activities covered by the *Noerr–Pennington* doctrine are nevertheless admissible to prove matters such as motive, opportunity, and intent. Fed.R.Evid. 403; *MCI Communications Corp. v. AT & T Co.,* 708 F.2d 1081, 1160 (7th Cir.) *cert. denied* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

56. There would be no point in listing each and every call put in evidence by Medco. Following is a brief account of some of the more salient ones. A series of telephone conference calls occurred over the September 17, 1995, weekend

were organized by one of the pharmacy trade associations, such as the Maryland Pharmacists Association ("MPhA"), the Maryland Association of Chain Drug Stores ("MACDS"), or the National Association of Chain Drug Stores ("NACDS").[57] One of these associations set up each call or meeting. Lobbyists and at least one representative of the sponsoring trade organization took part. The roster of participants often included pharmacy chains not named as defendants (for example, Safeway and CVS). There is abundant evidence that these trade association conferences addressed legitimate lobbying activities.

There is no evidence that these conferences were used to secure adherence to a group boycott. There is no evidence that the participants announced their companies' intentions with respect to Medco's network. There is likewise no evidence that any of the participants discussed the likelihood that Medco would succeed in assembling a network, and no evidence that the participants discussed either a strategy to sabotage the Maryland Plan, or which pharmacies were likely or unlikely to join.

The closest instance to improper conduct was a comment by EPIC Vice–President James Miller. Miller made the comment during a meeting organized by MACDS lobbyist Franklin Goldstein on September 29, 1995. Goldstein convened the meeting by letter dated September 22, 1995, for the express purpose of discussing the progress of the industry's lobbying efforts on the Medicaid "carve-out." Plaintiff's Exh. 49. In the letter, Goldstein also announced that the Health Subcommittee of the Maryland Senate Finance Committee was planning a hearing on fair pricing legislation for October 10, 1995. Goldstein suggested that the meeting be used to prepare a lobbying strategy for the upcoming hearing. *Id.*

In keeping with routine practice, Goldstein, upon convening the meeting, read aloud the MACDS's antitrust compliance policy statement. Apparently, halfway through the meeting, Miller remarked that "I don't know why we're having a meeting to discuss the Medicaid waiver since if the Maryland Plan goes through it will kill us." Wirth Dep. at 229. Immediately following Miller's interjection, Goldstein, recognizing that the comment was improper, again read the MACDS antitrust compliance statement, and the meeting went on as scheduled.

Medco claims that Miller's commentary was intended to signal EPIC's intentions concerning the Maryland Plan and lay the

---

following the award to Medco. These calls variously involved Rite Aid lobbyist Gary Alexander, Rite Aid's Vice President of Government and Trade Regulations James Krahulec, Rite Aid's Joel Feldman, EPIC lobbyist Dennis Rasmussen, EPIC/Eagle joint counsel Michael Brockmeyer, Maryland Association of Chain Drug Stores ("MACDS") lobbyist Franklin Goldstein, Maryland Pharmacists Association ("MPhA") Executive Director David Miller, Giant Chairman and CEO Martin Grass, Giant's Wirth, NeighborCare Executive Vice–President Stanton Ades, and National Association of Chain Drug Stores ("NACDS") Senior Director Margaret Worland. Medco contends that the subject of these calls was the Maryland Plan.

On Monday, September 18th, Worland circulated two notices to representatives of each defendant, as well as of retail pharmacists Revco, CVS, and Safeway, announcing a conference call scheduled for 2:00 p.m. on the next day, September 19th. The notices identified as the topic of the call the "recent contract to award the Maryland State Employees Prescription Benefit Program to an exclusive Medco mail order service." Plaintiff's Exh. 38. The call took place as scheduled.

On September 21st, Alexander met Feldman and EPIC/Eagle joint counsel Brockmeyer. Together, they attended a "debriefing" meeting at the Maryland Employee Benefits Division, where the State's Patrick Renaud explained the reasons why Eagle had not been awarded the PBM contract. EPIC Board President William Popomaronis was also present at the meeting. Immediately following the meeting, Alexander took part in another conference call organized by NACDS' Worland, and involving Rite Aid's Janet Hart, EPIC's James Miller, MPhA's David Miller, MACDS lobbyist Goldstein, and others. On September 29th, a meeting took place at MACDS lobbyist Franklin Goldstein's law offices. Among others, Rite Aid's Krahulec, Hart, and Alexander, EPIC's James Miller and Rasmussen, Giant's Wirth, NACDS' Worland, MPhA's David Miller, and Huseyin Tunc, Safeway Regional Pharmacy Supervisor, attended.

**57.** For example, the September 19, 1995, conference call was organized by Margaret Worland of the National Association of Chain Drug Stores ("NACDS").

groundwork for an illegal group boycott. A conspiracy, however, cannot be inferred from the actions of a single individual. There is no evidence that any other attendees at the meeting expressed agreement or otherwise commented on Miller's statement, or that any retailers' participation in the Maryland Plan was discussed. Moreover, there would be nothing improper about the defendants discussing the Maryland Plan or, under *Noerr–Pennington*, strategies to influence the government to change the Plan.

The teaching of *Superior Court Trial Lawyers Association*[58] is instructive in this respect. The Federal Trade Commission filed a complaint against an association of District of Columbia attorneys who regularly represented indigent defendants. Dissatisfied by the low hourly fees offered by the local government, the association's members met to complain, wrote letters to the government, sought community support for their position, and otherwise lobbied for higher rates. *In Re Superior Court Trial Lawyers Association, et al.,* 107 F.T.C. 510, 534–42 (1986). These activities were legal and proper. Only when the lawyers, in conjunction with their association, jointly agreed to decline future appointments unless the rates were raised (i.e. when the defendants agreed to a group boycott) did they cross the line and violate the antitrust laws. 493 U.S. at 428, 110 S.Ct. 768.

The facts of *Superior Court Trial Lawyers Association* are unique. The case cannot be translated entirely into a nonprofessional, i.e. commercial, setting involving competing companies. Nonetheless, *Superior Court Trial Lawyers Association* indicates that horizontal competitors (including pharmacies) enjoy an absolute right to band together in trade associations to lobby the government. *See Noerr,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464; *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626; and *California Motor Transp. Co.,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642. The mere fact of meeting and lobbying cannot support an inference of conspiracy. There must be evidence that the defendants used the trade association, or the otherwise legitimate meetings, as a vehicle for organizing a boycott. *Superior Court Trial Court Lawyers Association,* 493 U.S. at 424–25, 110 S.Ct. 768. In contrast to *Superior Court Trial Lawyers,* there is no evidence, beyond mere speculation, that the Maryland pharmacy industry meetings in the fall of 1995 served as a vehicle for a conspiracy.

Medco next claims that a conspiracy should be inferred from the fact that some participants denied taking part in a September 19, 1995, conference call. NACDS Senior Director Margaret Worland set up the call by memorandum circulated to representatives of each of the defendants, representatives of retail pharmacy chains Revco, CVS, Safeway, and Thrift Drug, Inc., and lobbyists Franklin Goldstein, Gary Alexander, and David Cohen. Plaintiff's Exh. 38. The announced purpose of the call was to discuss the award to Medco and the Maryland Plan's mail order component. *Id.*

During discovery, Medco secured the records of the telephone service that arranged the call. According to those records, the following persons, among others, participated in the call: Rite Aid's James Krahulec; his assistant, Janet Hart; Rite Aid lobbyist Gary Alexander; MACDS lobbyist Franklin Goldstein; NeighborCare's Stanton Ades; and Ms. Worland herself. Plaintiff's Exh. 39.[59] On deposition, Krahulec, Hart and Ades denied taking part in the call.[60] Medco claims that a reasonable jury could infer from these apparently false denials that the participants were covering up the conspiratorial nature of the conference call.

This argument is pure speculation. If the conference call were of exceptional length or importance, or if its content were extraordinary or memorable, then the participants'

---

58. 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990).

59. The records identify four additional individuals, whose positions and relationship to the parties are unknown to the Court, as participating in the call. *Id.*

60. Deposition of James Krahulec, at 145; Deposition of Janet Hart, at 145; Deposition of Stanton Ades, at 178.

failure to recollect might be significant. Here, however, there is no evidence that anything of exceptional importance or memorability was discussed during the call. The record demonstrates that the pharmacy industry is complex and characterized by a large number of telephone conversations and meetings. The failure of busy people to recall an ostensibly routine trade association meeting is unexceptional.

The organizer of the call, NACDS's Worland, did not deny participating in it, but could not remember it. Deposition of Margaret Worland at 73. On deposition, and even after being shown records, Worland had no recollection of the conference call. *Id.* at 76–77. Thus, Worland is in the same position as Krahulec, Hart and Ades—but there is no evidence, nor does Medco allege, that Worland participated in any conspiracy.[61]

Medco argues that some of these calls occurred in close proximity to certain events.[62] Using a *post hoc, ergo propter hoc* approach, Medco contends that the telephone

calls must have concerned these events. From these calls, Medco infers a hub and spoke conspiracy, with Rite Aid playing the pivotal role of the hub, contacting the other conspirators to keep them informed and secure their agreement.

The evidence, however, cannot be stretched this far. Most of the calls in question involve Rite Aid and one other defendant. For the vast majority of the calls, Medco provides no evidence of content. In addition, Rite Aid had legitimate reasons to be in contact with other defendants.[63] Moreover, with one exception, the calls between any defendant and NeighborCare involved NeighborCare lawyer/lobbyist Alan Rifkin rather than a NeighborCare employee.[64]

In the presence of legitimate reasons, an illegitimate contact may not be inferred. The quantity of the calls between Rite Aid and the other defendants does not alter the conclusion that, qualitatively, such calls do not tend to exclude the possibility of non-collusive conduct.[65] On this record, an infer-

---

61. In a similar vein, Medco seeks an inference of conspiracy from the assertion that Rite Aid allegedly violated the terms of a consent decree reached by Rite Aid in settlement of a 1989 complaint by the FTC in separate antitrust proceedings in New York. The inference sought by Medco, however, is not justified. The consent decree was not an adjudication of the merits of the FTC complaint, and it involved no admissions by Rite Aid concerning participation in an antitrust conspiracy. Other than Rite Aid, none of the defendants in this case were involved in the events leading up to the consent decree. Conversely CVS, which owns a substantial number of pharmacies in Maryland and also declined to participate in the Maryland Plan, but was not named a defendant in this case, was one of the signatories to the New York consent decree. Finally the FTC, which is the only party with standing to enforce the consent decree, conducted an investigation in this case and concluded that no action against any of the defendants was warranted. Under such circumstances, the mere existence of the New York consent decree fails to raise a genuine issue of material fact in this case, and an inference of conspiracy based on that consent decree would be entirely conjectural.

62. Such events include the September 13, 1995, award to Medco, and several subsequent lobbying activities in the fall of 1995.

63. As noted above, Rite Aid and EPIC shared an interest in the future of the Eagle bid protest.

Similarly, Rite Aid and Giant were engaged in negotiations over Giant's participation in the Pharmacy Card, Inc. ("PCI") network.

64. Only one call, which lasted less than one minute on December 21, 1995, was made from the offices of Rite Aid and involved NeighborCare's Ades. There is no evidence of the content of the call, and it would be speculative to infer a conspiracy simply from the fact that such a call occurred.

65. The probative insignificance of these calls is confirmed by the high degree of interpretive conjecture employed by Medco in the effort to lend the calls a conspiratorial flavor. For example, on deposition, Rite Aid's Feldman testified that on November 17, 1995, in the course of a telephone conversation regarding Giant's participation in the PCI program, Giant's Wirth mentioned to Feldman that Wirth had called a toll-free number established by Medco. Feldman Dep. at 420. By calling that number, Wirth told Feldman, Wirth had learned that Rite Aid was listed among the pharmacies participating in Medco's Maryland Plan. *Id.* Feldman responded with "some expletive" in reference to Medco. *Id.* Feldman testified that he then also called the toll-free number to ascertain that Giant pharmacies were not listed as participating in the Plan. *Id.* at 419.

Medco claims that Feldman's testimony supports an inference of conspiracy. Medco claims that by discussing the toll-free number, Wirth

ence of collusion would be based upon speculation rather than fact.

### d. Summary

In short, no evidence presented by Medco tends to exclude the possibility of independent conduct on the part of the defendants. It is true that the defendants saw the Maryland Plan, with its low reimbursement rate, as a problem. There is insufficient evidence, however, from which a reasonable jury could conclude that the defendants sought to scuttle the Plan through a group boycott.

When the evidence is viewed in a larger context, the plaintiff's conspiracy theory appears speculative. Each of the defendants presents credible, independent bases for electing not to join the Maryland Plan in the fall of 1995. There is little evidence of parallel conduct among the defendants beyond the ultimate fact that each declined to join. Other chain pharmacies, not alleged by Medco to be part of the conspiracy, also declined to join.

While there were many interfirm communications during the fall of 1995, Medco has failed to produce satisfactory evidence from which a fair-minded jury could infer that the contacts were conspiratorial. To permit a jury to infer a conspiracy on the basis of these contacts would risk chilling legitimate, pro-competitive trade association activities. In short, no reasonable jury could reach a verdict in Medco's favor without engaging in a high degree of speculation and conjecture. Accordingly, the Court shall grant summary judgment in favor of the defendants on Medco's antitrust claims.

### III. Medco's Other Claims

■ Medco's Lanham Act claim alleges that false and misleading statements contained in Rite Aid's December 21, 1995, advertisement caused the State of Maryland to rescind the PBM contract awarded to Medco. In order to prevail on a claim for false advertisement Medco must prove, *inter alia*, that the alleged deception was material, in that it was likely to influence the State of Maryland's decision to rescind the contract. *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 922 (3rd Cir.), *cert. denied*, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990). On the evidence presented, no reasonable jury could find that Medco has satisfied such a requirement.

Rite Aid's advertisement was published on December 21, 1995. The record shows, however, that by December 19th at the latest, the State was seriously concerned with Medco's ability to deliver the promised network on January 1, 1996. Deposition of Marita Brown at 90–91; Renaud Dep. at 243–44. On December 20th, the Board of Public Works threatened Medco with rescission of the PBM contract unless Medco could produce within three days a satisfactory "certified list" of participating pharmacies. Defendants' Exh. 188.

Three days past the deadline, on December 26th, Medco produced a list that Secretary Brown considered unreliable and unsatisfactory. Brown Dep. at 122–23. In addition, Brown, who was responsible for the decision to terminate the contract with Medco, testified unequivocally that she based her decision on information provided

and Feldman exchanged assurances that neither Rite Aid nor Giant intended to participate in the Maryland Plan. Medco argues that Feldman's expletive was a covert means of informing Wirth that, contrary to the information offered by Medco's toll-free number, Rite Aid was still intent on nonparticipation. According to Medco, Wirth's furnishing Feldman with the toll-free number was an indirect way of assuring Feldman that Giant was not participating either.

This interpretation finds no reasonable support in the record. As noted above, Wirth and Feldman engaged in frequent discussions concerning Giant's participation in Rite Aid's PCI program. On November 17, 1995, Wirth informed Feldman that Giant had decided to re-

turn to the PCI Program. Wirth Dep. at 308. There is nothing impermissible or even suspicious about the exchange between Wirth and Feldman. The toll-free number was generally available information, made public by Medco. Rite Aid and Eagle's position with respect to the Maryland Plan was similarly well-known. There is nothing in the record to suggest that the exchange between Wirth and Feldman effected an agreement of any kind with respect to participation in the Maryland Plan. In the absence of further indicia tending to exclude the possibility of legitimate conduct, to infer a conspiracy under these circumstances would be nothing short of pure speculation, in direct opposition to the pro-competitive rationale of the antitrust laws.

to her by Medco, and that Rite Aid's advertisement did not influence her in any way. Deposition of Marita Brown at 128–29. Accordingly, Medco's Lanham Act claim must fail.

Similarly, Medco's tortious interference claim must fail because it is predicated on the success of Medco's antitrust and Lanham Act claims. Accordingly, the Court shall grant the defendants' summary judgment on the entirety of Medco's complaint.

## IV. Rite Aid's Counterclaim

█ Rite Aid's Counterclaim focuses on a dispute between Rite Aid and Medco as to whether Rite Aid agreed to participate in Medco's standing Exclusive Provider Network ("EPN"). Using this network, which offered a reimbursement rate of AWP minus 15% plus $2.00, Medco serviced large clients, such as Texaco, Mellon Bank, and Holy Cross.

Rite Aid contends that it never agreed to join Medco's standing network, and that Medco was required to solicit Rite Aid's participation on a plan-by-plan basis. In its Counterclaim, Rite Aid claims that Medco duped individual Rite Aid pharmacists by misrepresenting to them that corporate Rite Aid had agreed to join the EPN. By this misrepresentation, Medco falsely induced pharmacists to fill prescription at the EPN rate, Rite Aid maintains.

The Counterclaim asserts causes of action for fraud (Count 1), negligent misrepresentation (Count 2), and unjust enrichment (Count 3). As damages under the first two counts, the Counterclaim seeks recovery of the difference between the CCN III rate (AWP minus 13% plus $2.00) and the EPN rate (AWP minus 15% plus $2.00) for each prescription that Medco wrongfully induced Rite Aid pharmacists to fill.

In order to recover for either intentional or negligent misrepresentation, however, Rite Aid must prove, *inter alia*, both the amount of damages suffered and that Medco's conduct caused such damages. *Finch v. Hughes Aircraft Co.*, 57 Md.App. 190, 231–32, 469 A.2d 867, *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied*, 469 U.S.

1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985); *Flaherty v. Weinberg*, 303 Md. 116, 135, 492 A.2d 618 (1985).

In the course of this litigation, Rite Aid effectively abandoned its Counterclaim. In response to Medco's interrogatories and document requests seeking information pertaining to Rite Aid's counterclaim damages, Rite Aid identified no documents or individuals with knowledge of such damages. Rite Aid identified no experts on these issues, and offers no testimony from any pharmacists as to their reasons for filling prescriptions at the EPN rate.

The only support offered by Rite Aid for damages on its Counterclaim is a summary chart, which Rite Aid first submitted with its opposition to Medco's cross-motion for summary judgment. The chart, Defendants' Exh. 211, purports to identify the number of prescriptions filled by Rite Aid pharmacists at the EPN rate in 1995. The chart, however, contains no information pertaining to the average wholesale price of each prescription, whether the prescription was for a branded or generic drug, or the amount Rite Aid was paid for each prescription. Under such circumstances, no reasonable jury could determine the causation or extent of any damages to Rite Aid from Medco's alleged misrepresentations.

█ Count 3 of Rite Aid's Counterclaim alleges that Medco was unjustly enriched as a result of the above misrepresentations. Rite Aid claims that certain benefits plans sponsors awarded contracts to Medco in reliance on Medco's unsubstantiated and inaccurate assertion that Rite Aid pharmacies would service the plans. To recover on this claim, Rite Aid must prove, *inter alia*, that Rite Aid conferred a benefit on Medco, and the value of such benefit. *Mass Transit Administration v. Granite Construction Co.*, 57 Md.App. 766, 774, 471 A.2d 1121 (Md.Ct. Spec.App.1984).

Rite Aid, however, offers no evidence to support a finding that the inclusion of Rite Aid pharmacies in the networks offered by Medco caused the plan sponsors, in whole or in part, to award the contracts to Medco. The record contains no testimony from any

plan sponsors, and no admission by Medco, to the effect that the inclusion of Rite Aid pharmacies was the cause of any plan's success. Rite Aid's corporate designee, Eric Elliott, admitted on deposition that he had no knowledge of the specific reasons why any particular contract was awarded to Medco. Deposition of Eric Elliot at 154.

In addition, Rite Aid has failed to introduce any evidence of the value of any benefit conferred on Medco by the allegedly improper inclusion of Rite Aid pharmacies in the networks in question. Under such circumstances, no reasonable jury could award damages to Rite Aid for unjust enrichment based on Medco's alleged misrepresentations.

Accordingly, the Court shall enter summary judgment against Rite Aid's Counterclaim.[66]

## V. Conclusion

For the reasons stated, the Court, by separate Order, shall grant the defendants' motion for summary judgment, and grant Medco's cross-motion for summary judgment on Rite Aid's Counterclaim.

---

**66.** Rite Aid does not oppose the entry of summary judgment as to Count 4 of its Counterclaim.